UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KOMBOOR GATLUAK GATNOOR,<br><br>Defendant. | 4:24-CR-40038-LLP<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Komboor Gatluak Gatnoor is before the court on an indictment charging him with possession of a firearm by a prohibited person (prior felony conviction). See Docket No. 1. Mr. Gatnoor has filed a motion to suppress certain evidence. See Docket No. 21. The United States ("government") resists the motion. See Docket No. 23. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 57.11.

## FACTS

An evidentiary hearing was held on September 12, 2024. Mr. Gatnoor was there in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley. The government was represented by Special Assistant United

States Attorney Mark Joyce. Three witnesses testified and four exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

At 1:26 a.m. on December 17, 2023, Sioux Falls Police Officers Kyle Ball and Nicolas Greisiger were on foot surveying the crowd in downtown Sioux Falls on the corner of 10th Street and South Phillips Avenue. Ex. 1 at 1:26:14; Ex. 2 at 1:26:15. There had been multiple calls from this area around this time of night for disorderly conduct and assaults. The Sioux Falls Police Department responded to the situation by posting officers to keep an eye on the scene when downtown bars were closing for the night, generally from midnight to 3 a.m.

The officers were on the west side of Phillips Avenue; a parking lot for the Phillips Avenue Diner was to their backside. The officers were facing toward the PAve bar, which was across the street on the east side of Phillips Avenue. Officer Ball testified he heard a car in the parking lot behind him start up and, while keeping his torso facing east, turned his head toward the west. He testified he saw a Chevy Malibu reversing out of a parking space in the diner parking lot. While Officer Ball was watching the vehicle, the front passenger window was rolled down and he saw the passenger throw a bottle out of the window. Officer Ball testified the bottle was recognizable as a bottle of liquor and later turned out to be an empty bottle of Hennessy.[1] The Malibu was the only vehicle being operated in the parking lot at the time.

---

[1] Hennessy is a brand name of cognac.

Officer Greisiger testified he heard a vehicle start up behind him and after it started, he heard a bottle clattering onto the surface of the parking lot. He testified that he did not turn around to see the vehicle and did not see the bottle being thrown as his attention was on the crowd in front of PAve across the street.

Officer Ball saw the Malibu drive toward the north exit of the parking lot and started to follow the car on foot. He told Officer Greisiger to follow him and to turn on his body camera. Officer Ball turned on his body camera as he came to the corner of the lot and could see that the Malibu was unable to exit through the north exit and would have to drive back past the officers in order to leave the lot. As the Malibu approached, Officer Ball held up his hand in a gesture to stop and ordered the driver of the vehicle, a female, to shut the engine off. Ex. 1 at 1:26:55 to 1:26:57. He reiterated the command a second time. Id. at 1:26:58.

Officer Ball approached the passenger side of the vehicle. The passenger, Mr. Gatnoor, can be heard saying in a loud voice, "Turn it off?" Officer Ball responded, "yeah, turn it off." Mr. Gatnoor then said, "what the [expletive]'s goin on?" Officer Ball responded in a similarly loud voice "What's your problem throwin' out the Hennessy bottle out of the car?" Mr. Gatnoor responded "That's not . . . the [expletive] I'm doing. Wrong car buddy." Officer Ball told Mr. Gatnoor he had watched him do it. Mr. Gatnoor said, "Watched me? Wrong guy buddy." Id. at 1:27:01 to 1:27:13.

Officer Ball told Mr. Gatnoor to exit the vehicle. Mr. Gatnoor stated he would step out of the vehicle but reiterated "Wrong guy. You got the wrong [expletive] guy." Id. at 1:27:13 to 1:27:18.

As Mr. Gatnoor got out of the car, Officer Ball testified he could see a bulge in the front of Mr. Gatnoor's waistband of his pants and was concerned there may be a weapon. He directed Mr. Gatnoor to turn around and place his hands on the vehicle preparatory to a pat search. As Officer Ball's hands neared Mr. Gatnoor's body to begin the pat search, Mr. Gatnoor took off running toward an adjacent parking garage and Officer Ball and Officer Greisiger gave chase. Mr. Gatnoor tripped over a curb within seconds and the officers apprehended him. Officer Ball never in fact pat searched Mr. Gatnoor before he took off running.

The officers handcuffed Mr. Gatnoor as he lay face down on the pavement. When the officers rolled him over to help him stand up, a handgun fell to the pavement from Mr. Gatnoor's clothing. A broken bottle of Hennessy was documented by the officers on the parking lot of the diner.[2] See Ex. 3 & 4. Mr. Gatnoor was arrested on state and city charges including littering, fleeing from police, and possession of a firearm while intoxicated. Docket No. 23 at p. 3.

---

[2] Officer Greisiger was cross-examined at the hearing regarding a report he apparently had written stating the bottle was found in the parking space the Malibu had occupied. At the hearing, he testified that the bottle was not in a parking space but in the middle of the throughway. Officer Greisiger's report was not offered into evidence.

After Mr. Gatnoor tried to flee from the officers, the driver of the Malibu, Ms. Elene Engida, drove off. She later returned on foot with another man. Ex. 2 at 1:39:02. Ms. Engida identified herself as Mr. Gatnoor's girlfriend and repeatedly insisted that the officers allow her to talk to him. Id. at 1:39:12 to 1:43:33. She also told Officer Ball two times that the whole incident was her fault as Mr. Gatnoor had thrown the bottle out the window of the Malibu at her request. Ex. 1 at 1:45:00 to 1:48:07.

Ms. Engida was called as a witness at the hearing and disavowed being Mr. Gatnoor's girlfriend; claimed she could not remember anything that happened the evening of December 17, 2023, after she drank shots at a bar; and claimed her statements to the officers that night were simply the ravings of an extremely intoxicated person. The court credits the video evidence of Ms. Engida's statements on the night in question, particularly her confirmation that Mr. Gatnoor did in fact throw a bottle out of the Malibu's window. In the video from the night of the event, Ms. Engida appears clear-headed, lucid, her movements do not indicate drunkenness, and her speech was not slurred. The court specifically finds Ms. Engida's in-court testimony at the hearing to lack any credibility at all.

The officers' body cameras were manually activated by the officers on the night of December 17, 2023. When activated, the cameras capture 30 seconds of video immediately preceding activation, although that 30-second segment does not have audio. Neither of the officers' body camera footage captures Mr. Gatnoor throwing the Hennessy bottle out the window of the Malibu.

Officer Ball testified that, even if his camera had already been activated before the bottle was thrown, the littering would not have been captured on video as the camera was positioned on his torso and his torso was facing PAve at the time the bottle was thrown. At this moment, only Officer Ball's head was turned toward the Malibu, not his torso and, thus, not his camera.

As part of the surveillance efforts downtown during bar closing, Officer Ball testified that the north entrance/exit to the Phillips Avenue Diner parking lot was blocked off by police. There are three parking garages near PAve and the officers testified these parking garages were especially problematic areas of criminal activity at night when the bars closed. Even though the north entrance had previously been blocked that night, Officer Ball testified that people would frequently move the barricades aside so that they could avail themselves of the north exit. Officer Ball testified that, until he rounded the corner of the diner parking lot, he was unsure whether the barricades were still in place and, therefore, whether the Malibu was going to evade him since he was on foot.

Mr. Gatnoor now moves to suppress the firearm discovered during his encounter with the police on December 17, 2023. Docket No. 21. He argues the police did not have reasonable suspicion to conduct a traffic stop on him and no legal basis for conducting a pat search of his person. Docket No. 22 at pp. 4-5. The government asserts that the officers' actions did not violate Mr. Gatnoor's Fourth Amendment rights. Docket No. 23 at pp. 4-9.

## DISCUSSION

### A.   Whether Police Had Reasonable Suspicion to Conduct the Stop

Mr. Gatnoor argues that because the body cameras worn by Officers Ball and Greisiger did not capture the alleged law violation—throwing an object out the window of a motor vehicle—that the government cannot demonstrate that it had reasonable suspicion for making the stop.  Docket No. 22 at p. 4.  The government responds that it need not have corroborating video footage in order to establish reasonable suspicion for the stop.  Docket No. 23 at p. 5.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  A "seizure" occurs when a reasonable person understands "that he [is] not at liberty to ignore the police . . . and go about his business."  Michigan v. Chesternut, 486 U.S. 567, 569 (1988).  Traffic stops are a type of seizure.  United States v. Sanchez, 955 F.3d 669, 674 (8th Cir. 2020) (citation omitted).  And so, on the Fourth Amendment's terms, a traffic stop must be reasonable.  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

"[A] traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred."  United States v. Green, 946 F.3d 433, 438 (8th Cir. 2019) (citation omitted).  When a police officer observes a traffic violation, no matter how minor, probable cause exists to initiate a stop.  United States v. Mendoza, 677 F.3d 822, 827 (8th Cir. 2012).

When a traffic stop is challenged, it is the government's burden to establish reasonable suspicion or probable cause. United States v. $45,000.00 in U.S. Currency, 749 F.3d 709, 716 (8th Cir. 2014) (citation omitted). The credible testimony of an officer as to his observations of a traffic violation is all that is required to satisfy that burden. Cf. Mendoza, 677 F.3d at 828. South Dakota law makes it a crime to throw litter from a motor vehicle upon (among other places) private property. SDCL § 34A-7-7.[3] The officers' testimony as well as the driver's statements on video in Exhibits 1 and 2 demonstrate that Mr. Gatnoor violated this law by throwing the empty Hennessy bottle out the window of the Malibu. The court specifically makes a finding that this evidence is credible. The evidence established reasonable suspicion for the stop.

Mr. Gatnoor concedes that his argument that there was no basis for the stop depends solely on this court finding the officers' testimony not worthy of credence. He points out that the testimony of the officers is not corroborated by video footage. But Fourth Amendment case law does not require corroborating video in order to justify a traffic stop. See United States v. Thomas, 4:22-CR-40046-1, 2023 WL 7390476, at *7 (D.S.D. Aug. 29, 2023), adopted 2023 WL 7103367 (D.S.D. Oct. 27, 2023).

---

[3] SDCL § 34A-7-7 provides in pertinent part as follows:
    No person may dump, deposit, drop, throw, discard, or otherwise dispose of litter from any motor vehicle upon any public highway, upon any public or private property or upon or into any river, lake, pond, stream, or body of water in this state except as permitted by law.

Mr. Gatnoor also argues that the officers should have immediately turned on their body cameras and, with the 30-second look-back feature, the littering would have been captured by video if it really occurred. But this is a red herring. Officer Ball testified his torso remained oriented toward PAve across the street so that even if his camera had been on, it would not have captured the littering event. Mr. Gatnoor's throwing of the Hennessy bottle was an unanticipated event from the standpoint of the officers. They cannot be faulted for not having their cameras pointed toward the Malibu when their primary reason for being at that location at that time was to monitor the crowds exiting from the bars on Phillips Avenue in the opposite direction.

Mr. Gatnoor suggests that if the bottle were thrown as Officer Ball testified, it would have landed directly behind Officer Ball so that no mere turn of the head would have allowed him to see the event. This suggestion is not borne out by this court's review of the video—the throwing of the bottle (as mentioned above) is not documented on either officers' body camera footage. Officer Ball testified he was able to see Mr. Gatnoor by turning his head and that his torso did slightly twist also. Moreover, there was a broken Hennessy bottle on the parking lot surface, which corroborates both officers' testimony. And the driver later returned to the scene and corroborated the fact that Mr. Gatnoor threw the bottle out the window, allegedly at her request. The video does not show any bottles on the parking lot other than the Hennessy bottle.

Mr. Gatnoor also suggests that the officers might be lying because they did not collect the Hennessy bottle itself (only photographs exist to document

9

it) and, therefore, they did not examine the bottle for fingerprints and DNA evidence. But at the time Mr. Gatnoor was arrested, he was being taken into custody for fleeing from a law enforcement officer and littering. It is simply not reasonable to assume that officers would subject a broken bottle to fingerprint and DNA testing for such minor offenses.

Mr. Gatnoor also suggests the officers were not truthful because Officer Greisiger wrote in his report that the Hennessy bottle was found in a parking space while at the hearing he testified the bottle was not in a parking space. But this discrepancy is minor, not material. Again, there was a bottle. There were not numerous bottles. The court finds this minor error in report writing does not shake the court's confidence in the credibility of Officer Greisiger.

Based upon the totality of the circumstances known to officers at the time they conducted the traffic stop of the Malibu Mr. Gatnoor was traveling in, the court concludes that there was reasonable suspicion to stop the vehicle. Accordingly, the court rejects Mr. Gatnoor's argument that the traffic stop of the Malibu violated his Fourth Amendment rights.

As a final note, there was testimony from Officer Ball that Mr. Gatnoor was dressed in a Chicago Bulls ball cap and a red hooded sweatshirt, which he believed to indicate Mr. Gatnoor may belong to either the Gangster Disciples gang or the Vice Lords gang. However, Officer Ball later clarified that Mr. Gatnoor's dress and any possible gang affiliation that clothing might indicate did *not* form part of the basis for his decision to conduct a traffic stop on the Malibu on the night in question.

The law requires the court to apply an objective standard to determine the lawfulness of the stop, so Officer Ball's subjective thoughts on the subject of possible gang membership are not the touchstone of reasonableness here. United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007) (stating "the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop."). See also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (*per curiam*) (same). Sioux Falls is located in the Midwest. The Bulls are a popular Midwest team and many individuals in Sioux Falls wear Chicago Bulls sports gear without belonging to a gang. In addition, the traffic stop occurred eight days before Christmas when many people dress in the colors of the season—green and red—so the fact that Mr. Gatnoor had a red hoodie on is likewise of little significance.

**B.      Whether Police Violated the Fourth Amendment by Pat Searching**

Even if the traffic stop was justified, Mr. Gatnoor argues police violated his Fourth Amendment rights by pat searching him. Docket No. 22 at p. 5. The government asserts no pat search occurred because Mr. Gatnoor bolted before a pat search could be conducted, but that the officers were nonetheless justified in conducting a pat search of Mr. Gatnoor. Docket No. 23 at pp. 6-7. Mr. Gatnoor's rejoinder, made at the hearing, is that the officer's attempted pat search was a but-for cause of Mr. Gatnoor running from them, and that he would not have run had the officers not attempted to pat him down.

Under the Fourth Amendment, citizens have the right "to be free from unreasonable governmental intrusion" on their persons. Terry v. Ohio, 392

11

U.S. 1, 9 (1968). In the case of a man walking down the street, Terry v. Ohio instructs that an officer's seizure of that man is valid if the officer has "reasonable and articulable suspicion that criminal activity may be afoot." United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999) (citing Terry, 392 U.S. at 25-31). Should a valid seizure initiate, the seizing officer may "take any additional steps that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" Id. (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). Where the officer has a reasonable, articulable suspicion that the suspect is armed and dangerous, one of those steps may be to "conduct a limited pat-down search of the individual's outer clothing for the purpose of uncovering concealed weapons." United States v. Gilliam, 520 F.3d 844, 847-48 (8th Cir. 2008).

In the context of a traffic stop, the first prong of the Terry analysis—the question of whether criminal activity may be afoot—is satisfied so long as the seizing officer has probable cause or reasonable suspicion that a traffic violation has occurred. Arizona v. Johnson, 555 U.S. 323, 327 (2009). In that event, the prong is satisfied not just as to the driver, but for "everyone in the vehicle." Id. (citation omitted). So, should the seizing officer have reasonable suspicion that anyone in the vehicle is armed and dangerous, the officer may conduct a safety pat-down of that occupant. Id. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27.

Whether an officer's suspicion is reasonable depends on "the totality of circumstances in light of the officers' experience and specialized training." United States v. Williams, 39 F.4th 1034, 1042 (8th Cir. 2022) (citations omitted). Factors that help inform the inquiry include time of day, United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2002), and whether the stop was conducted in a high-crime area. United States v. Stewart, 631 F.3d 453, 458 (8th Cir. 2011). "[A] law enforcement officer's observation of a bulge [is] a substantial factor." Roggeman, 279 F.3d at 579 (citations omitted).

Officer Ball testified the reason he asked Mr. Gatnoor to step out of the vehicle was so that he could issue a citation for littering and the remaining occupants of the vehicle would be free to go while he did this. As Mr. Gatnoor stepped out of the car, Officer Ball observed a bulge in his waistband and suspected a handgun might be concealed there. In addition, the fact that the object Mr. Gatnoor threw was an empty alcohol container raised the possibility that Mr. Gatnoor may be inebriated while possessing a firearm, a violation of state law.

In addition to these facts specific to Mr. Gatnoor, the time of night and the uptick in lawless behavior at this location at this precise time (bar closing) are also part of the totality of circumstances which the court considers. Based on the totality of circumstances, the court finds Officer Ball had reasonable suspicion to believe Mr. Gatnoor was armed. Therefore, he was justified in seeking to conduct a pat down search.

Once Mr. Gatnoor took off running, he committed the crime of fleeing from a law enforcement officer.  See SIOUX FALLS, S.D., CODE OF ORDINANCES § 131.021 (1994).  The officers were justified in apprehending him and arresting him.  It was then that the handgun Mr. Gatnoor concealed on his person was discovered.  The pat down or attempted pat down of Mr. Gatnoor did not violate the Fourth Amendment.  As such, the court recommends that Mr. Gatnoor's motion to suppress be denied in its entirety.

Again, Mr. Gatnoor suggests that, because the bulge in his waistband is not visible on Officer Ball's body camera footage that it was not in fact there.  Officer Ball's body camera lens was aimed about chest-high on Mr. Gatnoor.  The fact that Mr. Gatnoor's waistband was not in camera view does not cause the court to doubt Officer Ball's testimony.  Mr. Gatnoor also suggests that the gun could not have been visible because he was wearing a hoodie at the time.  But Officer Ball indicated that Mr. Gatnoor's pants were hitched very low and that the waistband of the pants was below the bottom of the hoodie.  This is corroborated by the video documenting when Mr. Gatnoor was apprehended after his flight.  His pants were very low and revealed a sizeable portion of his underwear.  Finally, Officer Ball's testimony that he observed a bulge in Mr. Gatnoor's waistband is corroborated by the fact that a handgun was ultimately recovered from approximately this location when Mr. Gatnoor was apprehended.

## C. Fruit of the Poisonous Tree

Mr. Gatnoor's final argument is that, because his Fourth Amendment rights were violated by the traffic stop and pat down search, all evidence obtained from the traffic stop and afterward must be suppressed as fruit of the poisonous tree of the original unconstitutional action. But this court finds that Mr. Gatnoor's Fourth Amendment rights were not violated. Thus, there is no poisonous fruit to suppress.

## CONCLUSION

Based upon the above-recited facts, law, and analysis, this magistrate judge respectfully recommends that Mr. Gatnoor's motion to suppress [Docket No. 21] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 16th day of September, 2024.

BY THE COURT:

_Veronica L. Duffy_
VERONICA L. DUFFY
United States Magistrate Judge

15