UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KOMBOOR GATLUAK GATNOOR,<br><br>Defendant. | 4:24-CR-40038-RAL<br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION |

Defendant Komboor Gatluak Gatnoor was indicted for possession of a firearm by a prohibited person. Doc. 1. Gatnoor moved to suppress the gun discovered during his police encounter, alleging the gun was discovered after an unlawful stop and pat-down. Doc. 21. The Government resists the motion. Doc. 23. United States Magistrate Judge Veronica Duffy held an evidentiary hearing on the motion on September 12, 2024, after which Judge Duffy issued a report and recommendation denying Gatnoor's motion. Doc. 27. Gatnoor timely filed objections to the report and recommendation, challenging some of Judge Duffy's factual findings and legal conclusions. Doc. 32.

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the

court considers appropriate.'" United States v. Murrillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)). Having conducted a de novo review of those portions of the report and recommendation to which Gatnoor objects, this Court adopts the report and recommendation.

I. **Factual Background**

On December 17, 2023, at 1:26 a.m., Sioux Falls Police Officers Kyle Ball and Nicolas Greisiger were assigned to patrol the corner of W. 10th Street and Phillips Avenue in downtown Sioux Falls, South Dakota, due to a recent increase in criminal activity, including assaults, occurring around bar closing time. Doc. 28 at 6-7, 52. Both officers were on foot, standing on the west side of Phillips Avenue facing east towards PAve, a bar located on Phillips Avenue. Id. at 7. Behind the officers was the Phillips Avenue Diner parking lot. Id. at 8.

Officer Ball testified that, while on patrol, he heard a car start in the Phillips Avenue Diner parking lot, which prompted him to turn towards the lot. Doc. 28 at 8. Once he was turned toward the lot, Officer Ball testified that he saw a glass bottle get thrown out of the front seat passenger side window of a Chevrolet Malibu as the car was backing out of a parking spot. Id. Officer Greisiger testified that while he was facing PAve, he heard a car start and a bottle drop behind him. Id. at 53. He did not see where the bottle came from. Id. After hearing the bottle drop, Officer Greisiger turned around toward the parking lot and observed a silver Malibu backing out of a parking spot. Id. at 54. He did not observe any other vehicle operating in the lot. Id. After backing out of the parking spot, the Malibu drove toward the north exit of the parking lot. Ex. 1

2

at 1:26:21. Both officers followed the vehicle on foot. As the officers were walking through the lot, they both activated their body cameras.[1] Ex. 1 at 1:26:42.

Because the north exit of the lot was blocked off, the Malibu was unable to exit and had to turn around back towards the approaching officers. Ex. 1 at 1:26:53. As the Malibu creeped toward the officers, Officer Ball held up his hand, signaling to the driver to stop the vehicle, and twice ordered the driver to "turn it off." Ex. 1 at 1:26:55-26:58. The driver complied. Officer Ball walked to the passenger side of the Malibu, while Officer Greisiger approached the driver with his flashlight on. As Officer Ball approached the passenger side, the passenger, later identified as Gatnoor, asked "turn it off?" Ex. 1 at 1:27:01. Officer Ball responded "yeah, turn it off." Ex. 1 at 1:27:02. Mr. Gatnoor said back, "what the fuck's going on?" Ex. 1 at 1:27:03. Officer Ball asked, "what's your problem throwing out the Hennessy bottle out of the car?" Ex. 1 at 1:27:04. Mr. Gatnoor answered, "that's not . . . the fuck . . . wrong car buddy." Ex. 1 at 1:27:06. Officer Ball then said he watched Gatnoor throw the bottle. Mr. Gatnoor said, "Watched me? Wrong guy buddy." Ex. 1 at 1:27:11.

Officer Ball testified that he noticed a bulge in Gatnoor's front waistband while speaking to Gatnoor. Doc. 28 at 11. Based on his training and experience, Officer Ball was concerned that the bulge was a gun. Id. at 12. Officer Ball also testified that Gatnoor's clothing stood out to him. Id. at 11. Based on his training and experience, Officer Ball associated Gatnoor's Chicago Bulls hat and red hooded sweatshirt with two gangs, the Gangster Disciples and Vice Lords. Id. However, Officer Ball also testified that the Phillips Avenue Diner parking lot is not an area known

---

[1] At the evidentiary hearing, Officer Ball explained that once his body camera is activated, it begins recording both audio and video. Additionally, the camera will save thirty seconds of video immediately prior to the camera being activated. However, it does not save the audio from those thirty seconds. Thus, an observer can detect the moment an officer activates their body camera when audio begins playing. Doc. 28 at 19-20.

3

for gang activity and that he had no prior knowledge of Gatnoor prior to the stop. Id. at 31, 33. Based on these observations, Officer Ball decided he was going to conduct a pat-down of Gatnoor. Id. at 12.

Officer Ball then told Gatnoor to step out of the vehicle and to "turn and face away" from him. Ex. 1 at 1:27:12-27:18. While Gatnoor was exiting the vehicle, Officer Ball placed his right hand on Gatnoor's left arm to direct Gatnoor's body to face the vehicle so that Officer Ball could conduct a pat-down search. Ex. 1 at 1:27:19; Doc. 28 at 12. Before Officer Ball could place another hand on Gatnoor, Gatnoor began to flee, running north into the adjacent parking ramp. Doc. 28 at 13; Ex. 1 at 1:27:21. Officers Ball and Greisiger ran after him. Seconds after Gatnoor ran off, he tripped on a curb and fell, and Officers Ball and Greisiger immediately apprehended him. Ex. 1 at 1:27:29. As the officers attempted to raise Gatnoor off the ground, a gun fell from Gatnoor's person and onto the ground. Ex. 2 at 1:27:52.

During the officers' pursuit of Gatnoor, the driver of the Malibu, later identified as Elene Engida, drove off. She returned on foot with another individual several minutes after Gatnoor was arrested. Ex. 2 at 1:39:03. Engida identified herself as Gatnoor's girlfriend. Ex. 2 at 1:39:14. As Officer Ball was explaining to Engida why Gatnoor was under arrest, Engida told Officer Ball that it was her fault that Gatnoor threw the bottle, saying that she "told him to get rid of it." Ex. 1 at 1:45:02. Engida was called as a witness at the evidentiary hearing. Doc. 28 at 67. At the hearing, she testified that she was not in a romantic relationship with Gatnoor and that she was intoxicated the evening of December 17, 2023, and could not remember anything that occurred. Id. at 68.

## II. Discussion

The Fourth Amendment protects "the right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Not all searches and seizures

4

conducted by police are forbidden by the Fourth Amendment—its protections extend only to unreasonable searches and seizures: "Reasonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Cnty. of Los Angeles v. Mendez, 581 U.S. 420, 427 (2017) (cleaned up and citations omitted). "In some circumstances, such as when faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." Maryland v. King, 569 U.S. 435, 447 (2013) (cleaned up and citation omitted).

Gatnoor argues that the traffic stop and subsequent pat-down were unlawful, and as a result, the gun should be excluded under the fruit of the poisonous tree doctrine. Doc. 22. In response, the Government first argues that the officers had reasonable suspicion to conduct the stop. Doc. 23. The Government also disputes whether a pat-down ever occurred, but in the event this Court finds there was a pat-down, the Government argues that the officers had reasonable suspicion. Id. The Government finally argues that regardless of the legality of the stop or search, there was an independent basis for discovering the gun. Id.

### A. Traffic Stop

A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Fields, 832 F.3d 831, 834 (8th Cir. 2016) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). A traffic stop is "a relatively brief encounter and is more analogous to a so-called 'Terry stop' . . . than to a formal arrest." Knowles v. Iowa, 525 U.S. 113, 117 (1998)

5

(cleaned up and citation omitted). Thus, to conduct a lawful traffic stop, an officer need only a reasonable, articulable suspicion that criminal activity is afoot. See United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007).

Reasonable suspicion exists when an "officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012) (cleaned up and citation omitted). When more than one officer is conducting an investigation, reasonable suspicion may be based on the collective knowledge of the officers involved, and "the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." United States v. Rederick, 65 F.4th 961, 966 (8th Cir. 2023). Reasonable suspicion is determined by the totality of the circumstances, "taking into account an officer's deductions and rational inferences resulting from relevant training and experience." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010).

Here, Officers Ball and Greisiger conducted a traffic stop of the silver Malibu in which Gatnoor was a passenger. As justification for the traffic stop, Officer Ball testified that he personally observed Gatnoor throw a Hennessy bottle from the passenger window of the Malibu. It is difficult to reconcile Officer Ball's testimony that he personally observed Gatnoor throw the glass bottle with what is captured on Officer Ball's body camera. The body camera footage shows that Officer Ball's torso was facing east towards PAve, away from the parking lot when the bottle was thrown. Officer Ball testified that officers are trained to activate their body cameras as soon as they witness a violation occur, Doc. 28 at 23, but Officer Ball did not activate his camera until quite a few seconds after the violation occurred. Although Officer Ball may not have actually observed Gatnoor throw the bottle, this does not mean that Officer Ball falsified his testimony.

See United States v. Morgan, No. 09–CR–00573, 2010 WL 4168624, at *2 (E.D.N.Y. Oct. 19, 2010) ("It is a common occurrence that a witness will draw an inference based on direct observations at the time an event occurs, and the inference will then be remembered as a direct observation months later."). Regardless of the reliability of Officer Ball's testimony, there was reasonable suspicion to conduct the stop.

Officer Greisiger testified that he heard a bottle hit the ground in the parking lot, which caused him to turn towards the lot. Officer Ball likely reacted similarly. After turning towards the lot, both officers observed the Malibu backing out of a parking spot in the lot with the passenger window rolled down. Neither officer observed other pedestrians or vehicles being operated in the area, suggesting there was no other source of the liquor bottle but the Malibu. From these observations, it was reasonable for the officers to suspect that Gatnoor had just thrown the glass bottle out of the opened passenger window of the Malibu onto the parking lot. Moreover, South Dakota law provides, "[n]o person may dump, deposit, drop, throw, discard, or otherwise dispose of litter from any motor vehicle upon any public highway, upon any public or private property or upon or into any river, lake, pond, stream, or body of water in this state except as permitted by law." SDCL 34A-7-7. The totality of circumstances demonstrates that there was an objectively reasonable basis for suspecting that Gatnoor violated South Dakota's littering statute. Therefore, the stop was lawful.

The thrust of Gatnoor's objection to a finding of reasonable suspicion is that Officers Ball and Greisiger were not credible. Doc. 32 at 3-4. To support his claim, Gatnoor points to the lack of corroborating video evidence and various alleged inconsistencies in the officers' testimony. First, Gatnoor observes that Officer Ball wrote in his report that the Malibu "sped away," but during his testimony, he said the Malibu was merely moving. Second, Gatnoor points out that

7

Officer Greisiger first reported that the liquor bottle was in a parking spot, but later testified that it was not. Finally, Gatnoor notes that, between his report and testimony, Officer Ball was inconsistent on when he suspected potential gang affiliations due to Gatnoor's clothing.

These concerns do not undermine a finding of reasonable suspicion. "The constitutional bar police must clear to lawfully pull a car over is quite low . . . [T]he Fourth Amendment requires that police officers be reasonable, not perfect." United States v. Guerue, 647 F.Supp. 744, 755-56 (D.S.D. 2022). Although the body camera footage does not corroborate every detail, much of the testimony is consistent with the body camera footage. The body camera footage shows that something prompted the officers to turn towards the Phillips Avenue Diner parking lot and that the Malibu was the only car operating in the vicinity. The inconsistencies involving how the Malibu drove through the parking lot and the location of the liquor bottle do not undermine the conclusion that the officers believed a liquor bottle had been tossed from the Malibu. After all, Engida's statements to the officers after Gatnoor's arrest corroborated the officers' testimony that a glass bottle was thrown in the Phillips Avenue parking lot, even though she may have been so drunk that she does not now recall the events of December 17, 2023. Finally, Gatnoor's choice of clothing did not factor into Officer Ball's decision to stop the vehicle, Doc. 23 at 5-6, though it may have played some role in Officer Ball's decision to pat-down Gatnoor, which is addressed further below.

### B. Pat-Down

After conducting a lawful stop, an officer may conduct a pat-down search of a suspect for weapons if the officer has reasonable, particularized suspicion that the suspect is armed and dangerous. See United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997). A pat-down search is limited to the outer clothing of a suspect for the purpose of uncovering concealed weapons. See

United States v. Gilliam, 520 F.3d 844, 848 (8th Cir. 2008). "The sole justification for such a search is the protection of the officer and others." United States v. Hanlon, 401 F.3d 926, 929 (8th Cir. 2005) (cleaned up and citation omitted). Like with a stop, reasonable suspicion is determined by the totality of the circumstances, "taking into account an officer's deductions and rational inferences resulting from relevant training and experience." Horton, 611 F.3d at 940.

First, this Court must determine whether a pat-down search occurred. The Government contends that a pat-down search never occurred because Gatnoor ran away before Officer Ball ever placed his hands on Gatnoor. Doc. 23 at 6. The Government seems to suggest that a pat-down search does not occur until the intrusive physical contact is made. This Court disagrees.

Although a pat-down frisk undoubtedly occurs when an officer begins patting down the outer clothing of a suspect, there are circumstances where a pat-down search begins before such contact is made. See United States v. Wetmore, 560 F.Supp.3d 591, 608-09 (D.N.H. 2021) (collecting cases). When an officer forms the intent to conduct a pat-down search and communicates that intent to the suspect before making physical contact, either by words or actions, a search has begun. See Thomas v. Dillard, 818 F.3d 864, 875 (9th Cir. 2016) (search occurred when officer "unholstered his Taser, pointed it at Thomas and ordered Thomas to submit to a frisk for weapons"); Doorbos v. City of Chicago, 868 F.3d 572, 581 (7th Cir. 2017) (describing situations when a frisk is initiated without physical contact being made). For example, when an officer commands a suspect to "face and place his hands on the vehicle" in anticipation of physically patting down the suspect, a search has begun. Wetmore, 560 F.Supp. at 609. Additionally, when an officer tells a suspect that they are going to conduct a pat-down and physically directs the suspect's movement against a wall to facilitate the pat-down, a search has

9

begun. See Unites States v. Sykes, No. 17-CR-2009, 2017 WL 1455968, at *7 (N.D. Iowa Apr. 21, 2017).

Here, Officer Ball directed Gatnoor out of the vehicle with the intent to conduct a pat-down search. As Gatnoor exited the vehicle, Officer Ball commanded Gatnoor to "turn and face away" from him. Officer Ball then placed his right hand on Gatnoor's left arm to direct Gatnoor's body to face the vehicle. Through his words and actions, Officer Ball communicated his intent to Gatnoor that he was going to conduct a pat-down search. Although he did not begin patting Gatnoor down, Officer Ball did initiate a pat-down search.

Next, this Court must decide whether there was reasonable suspicion for Officer Ball to conduct the pat-down search. As stated above, an officer may conduct a pat-down search of a suspect for weapons if the officer has reasonable, particularized suspicion that the suspect is armed and dangerous. See Robinson, 119 F.3d at 667. "This analysis looks at such facts as the time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005) (cleaned up and citation omitted). Moreover, an officer's observation of a bulge that is suspected to be a weapon is a "substantial factor." United States v. Roggeman, 279 F.3d 573, 579 (8th Cir. 2002).

Here, there was reasonable suspicion to justify the pat-down of Gatnoor. First, Officers Ball and Greisiger were specifically assigned to the corner of W. 10th Street and Phillips Avenue due to a recent increase in criminal activity involving violence and disorderly conduct around bar closing time. See United States v. Cotton, 782 F.3d 392, 396 (8th Cir. 2015) (holding frisk was justified in part because the encounter occurred in a "violent area"). Moreover, they were on patrol late at night and their interaction with Gatnoor occurred around 1:26 a.m. See Roggeman, 279 F.3d at 578 (holding pat-down search was justified in part because the search occurred late at night).

10

Most importantly, Officer Ball observed a bulge in Gatnoor's front waistband. Id. at 579 (holding officer had reasonable suspicion to conduct a pat-down search after observing a bulge in suspect's front right pocket). These factors, taken together, would justify a reasonable officer to suspect Gatnoor was armed and could pose a risk to officer safety justifying a pat-down search.

In its response, the Government also argued that the pat-down was supported by Gatnoor's clothing and its possible affiliation with gangs. Doc. 23 at 6-7. Then, at the hearing, Officer Ball testified that Gatnoor's clothing had no bearing on his decision to pat down Gatnoor. Doc. 28 at 46-47. However, in its post-testimony argument, the Government stated that it stood by its position regarding Gatnoor's clothing. Doc. 28 at 76. Despite Officer Ball's testimony, the "subjective intentions of the officer" are irrelevant, United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007), so this Court will address the issue briefly. In determining whether there was reasonable suspicion to conduct a pat-down search, a suspect's known gang affiliation can be relevant. See United States v. Roelandt, 827 F.3d 746, 749 (8th Cir. 2016) (finding there was reasonable suspicion where the defendant had known gang affiliation). However, mere speculation that an individual is associated with a gang based on their clothing, without any other evidence tying the individual to a gang, does not constitute reasonable suspicion. See United States v. McKinney, 980 F.3d 485, 492-93 (5th Cir. 2020) (holding that an individual's choice of red clothing alone would not justify a stop despite red being the color of choice for a gang); United States v. Marcelino, 736 F.Supp.2d 1343, 1349-50 (N.D. Ga. 2010) (holding allegation of gang affiliation based on clothing "tenuous at best" and that it did not support a finding of reasonable suspicion). A suspect's choice of clothing, in addition to something else—the suspect is known to be a member of a gang, or the suspect is in an area with gang activity—could support reasonable suspicion. See United States v. Nash, No. 8:10CR45, 2011 WL 22665, at *1 (D. Neb. Jan. 3, 2011)

11

(finding reasonable suspicion when defendant was observed wearing orange hat in an area of known gang activity). Here, neither officer knew Gatnoor or was aware of any past affiliations with gangs. Officer Ball also testified that the Phillips Ave Diner parking lot is not an area known for gang activity. Clothing alone is insufficient to tie Gatnoor to gang activity, but there was separate reasonable suspicion to search Gatnoor based on the bulge in Gatnoor's front waist band.

Gatnoor's main objection again involves officer credibility. Specifically, Gatnoor objects to the finding that Officer Ball saw a bulge in Gatnoor's waistband as he exited the vehicle. Doc. 32 at 6. Gatnoor observes that the body camera footage does not show a bulge, the parking lot was poorly lit, Gatnoor was wearing a loose hoodie, he was bent over when he exited the vehicle, and that he was turned away from Officer Ball immediately upon exiting the vehicle. Id. This Court finds Officer Ball's testimony on this point credible. Although the body camera footage does not capture the bulge in Gatnoor's waistband, the footage demonstrates Officer Ball was facing Gatnoor when he exited the Malibu and would have had an opportunity to see a bulge in Gatnoor's waistband. Moreover, the footage demonstrates that there was adequate lighting in the parking lot and that there was a sufficient amount of time for Officer Ball to observe the bulge.

Finally, even if this Court were to find that the stop and pat-down search were unlawful, there was a lawful independent basis to detain Gatnoor after the stop and pat-down search. "[A] defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest." United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995). The Eighth Circuit has consistently recognized that a suspect's flight or resistance to a Terry stop constitutes an independent basis for an arrest, and evidence obtained from the subsequent arrest is not subject to the exclusionary rule. See United States v. Flores-Lagonas, 993 F.3d 550, 560-61 (8th Cir. 2021); United States v. Smith, 789 F.3d 923, 929 (8th Cir. 2015).

Here, Gatnoor's "resistance would have provided a reasonable officer with probable cause for arrest under [South Dakota] law." United States v. Collins, 200 F.3d 1196, 1198 (8th Cir. 2000); SDCL § 22-11-4. During Gatnoor's arrest, Officers Ball and Greisiger discovered the gun. "[A]ssuming arguendo that [Officer Ball's] initial stop and [search] of [Gatnoor] were invalid, [Gatnoor's] resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person . . . is admissible." Dawdy, 46 F.3d at 1431.

### C. Fruit of the Poisonous Tree

"While the Fourth Amendment itself may not provide a constitutional remedy for violations of its commands, evidence obtained through an illegal search and seizure is generally inadmissible against the accused in a criminal prosecution." Guerue, 647 F.Supp. at 754. "The exclusionary rule extends to evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." United States v. Tuton, 893 F.3d 562, 568 (8th Cir. 2018) (cleaned up and citation omitted). However, "for there to be 'fruit,' there must first be a 'poisonous tree,' that is, an illegal search or seizure or an illegality." United States v. Finley, 56 F.4th 1159, 1166 (8th Cir. 2023) (cleaned up and citation omitted).

Here, the gun cannot be excluded as the fruit of illegal conduct because there was no illegal conduct. Both the stop and pat-down were supported by reasonable suspicion.

### III. Conclusion

For the foregoing reasons, it is hereby

ORDERED that Gatnoor's objections to the report and recommendation, Doc. 32, are overruled. It is further

ORDERED that the report and recommendation, Doc. 27, is adopted. It is further

ORDERED that Gatnoor's motion to suppress, Doc. 21, is denied.

13

DATED this 18th day of October, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE